**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**UNITED STATES OF AMERICA,**

    **- v. -**

**MATTHEW D. WEITZMAN,**

            **Defendant.**

09 Cr. 989 (AKH)

## SENTENCING MEMORANDUM OF DEFENDANT
## MATTHEW D. WEITZMAN

BRACEWELL & GIULIANI LLP
1251 Avenue of the Americas
New York, New York 10020-2714
(212) 508-6100

Attorneys for Defendant

Of Counsel:
    Marc L. Mukasey
    Craig S. Warkol
    Amy L. Katcherian

## TABLE OF CONTENTS

**Page(s)**

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS .................................................................................................... 1

    A.    The Offense Conduct And Guilty Plea ................................................................ 1

    B.    Personal History ............................................................................................... 3

        1. Childhood History And Relationship With Sister ............................................. 3

        2. Relationship With Family ................................................................................ 5

            a. Relationship With Wife and Kids .............................................................. 6

        3. Employment History ....................................................................................... 9

        4. Standing In The Community ........................................................................... 10

    C.    Matt Self-Reports To The Government And The Guilty Plea ............................ 13

        1. Matt Self-Reports To Government Authorities .............................................. 13

        2. The Plea Agreement, Allocution, And SEC Settlement ................................. 13

ARGUMENT

        THE FACTORS SET FORTH IN § 3553(A) COUNSEL A
        SENTENCE BELOW THE STIPULATED GUIDELINES RANGE ................ 15

    A.    Applicable Law ................................................................................................ 15

    B.    Discussion ........................................................................................................ 17

        1. Matt's History And Characteristics ................................................................ 17

            a. Childhood Background ............................................................................ 17

            b. Devoted Father To His Two Sons ............................................................ 19

        2. The Nature And Circumstances Of The Offense ............................................ 21

        3. Need To Make Restitution To Victims ........................................................... 23

        4. Need To Provide Specific Deterrence ............................................................ 24

        5. Need To Afford Adequate General Deterrence ............................................... 25

        6. Need To Facilitate Rehabilitation .................................................................. 27

        7. Other Factors Counsel Against Lengthy Sentence ......................................... 28

CONCLUSION .................................................................................................................. 30

## TABLE OF AUTHORITIES

**Page(s)**

CASES

Gall v. United States,
552 U.S. 38 (2007)............................................................................................15, 16

Nelson v. United States,
---U.S.----, 129 S. Ct. 890 (2009) ............................................................................15

Primo v. United States,
No. Cv-07-3387 (CPS), 2008 WL 428449 (E.D.N.Y. Feb. 14, 2008)....................21

United States v. Adelson,
441 F. Supp.2d 506 (S.D.N.Y. 2006)..............................................................26, 28

United States v. Arreaga,
No. S303CR.1121-02 (RWS), 2006 WL 278156 (S.D.N.Y. Feb. 2, 2006)...........27

United States v. Behrendt,
No. 08-CR-71, 2008 WL 4643380 (E.D. Wis. Oct. 20, 2008) ...............................24

United States v. Booker,
543 U.S. 220 (2005).....................................................................................15, 16

United States v. Brady,
417 F.3d 326 (2d Cir. 2005)....................................................................................19

United States v. Butler,
No. 08-CR-370, 2010 WL 234848 (E.D.N.Y. Jan. 22, 2010) ...............................20

United States v. Castillo,
No. 03-CR-835 (RWS), 2007 WL 582749 (S.D.N.Y. Feb. 26, 2007)..............18, 19

United States v. Cavera,
550 F.3d 180 (2d Cir. 2008)...........................................................................15, 16, 17

United States v. Cho,
No. 08-CR-332, 2009 WL 5322746 (E.D.N.Y. Oct. 6, 2009) ...............................21

United States v. Crosby,
397 F.3d 103 (2d Cir. 2005)..........................................................................15, 16

United States v. Davis,
No. 07 Cr. 727 (HB), 2008 WL 2329290 (S.D.N.Y. June 5, 2008) .................19, 20

United States v. Erskine,
    280 Fed. App'x 16, 2008 WL 2228600 (2d Cir. May 28, 2008)..............................................18

United States v. Harding,
    No. 05 CR. 1285-02 (RWS), 2006 WL 2850261(S.D.N.Y. Sept. 28, 2006)...........................20

United States v. Jiang,
    No. 09-CR-34, 2009 WL 3254434 (E.D.N.Y. Oct. 9, 2009)...........................................20, 21

United States v. Kimbrough
    552 U.S. 85 (2007) ............................................................................................................15

United States v. Langford,
    516 F.3d 205 (3d Cir. 2008)..............................................................................................16

United States v. Milne,
    384 F. Supp.2d 1309 (E.D. Wis. 2005)...............................................................................25

United States v. Mizrahi,
    No. 00-CR-960 (JBW), 2008 WL 3009983 (E.D.N.Y. June 16, 2008)..................................22

United States v. Patzer,
    548 F. Supp.2d 612 (N.D. Ill. 2008) ..................................................................................18

United States v. Peterson,
    363 F. Supp.2d 1060 (E.D. Wis. 2005)...............................................................................24

United States v. Regensberg,
    635 F. Supp.2d 306 (S.D.N.Y. 2009)..................................................................................22

United States v. Selioutsky,
    409 F.3d 114 (2d Cir. 2005)...............................................................................................20

United States v. Tann,
    332 Fed. App'x 674, 2009 WL 1605124 (2d Cir. June 9, 2009)...........................................18

United States v. Taylor,
    No. 07 Cr. 247 (RSW), 2008 WL 2332314 (S.D.N.Y. June 2, 2008) .............................22, 23

United States v. Toback,
    No. 01 Cr. 410, 2005 WL 992004 (S.D.N.Y. Apr. 19, 2005)................................................16

United States v. Verkhoglyad,
    516 F.3d 122 (2d Cir. 2008)...............................................................................................16

STATUTES AND REGULATIONS

15 U.S.C. § 78ff ...................................................................................................................2

15 U.S.C. § 78j(b) .................................................................................................2

15 U.S.C. § 80b-6 .................................................................................................2

15 U.S.C. § 80b-17 ...............................................................................................2

17 C.F.R. § 240.10b-5 ..........................................................................................2

18 U.S.C. § 2 .....................................................................................................2, 3

18 U.S.C. § 1343 ...................................................................................................3

18 U.S.C. § 3553(a) .......................................................................................passim

18 U.S.C. § 3553(a)(1) ..............................................................................16, 17, 21

18 U.S.C. § 3553(a)(2) .........................................................................................16

18 U.S.C. § 3553(a)(2)(B) ....................................................................................25

18 U.S.C. § 3553(a)(2)(C) ....................................................................................24

18 U.S.C. § 3553(a)(2)(D) ....................................................................................27

18 U.S.C. § 3553(a)(7) ...................................................................................17, 23

18 U.S.C. § 3553(b)(1) .........................................................................................15

18 U.S.C. § 3742(e) ..............................................................................................15

## SENTENCING GUIDELINES

U.S.S.G. § 2B1.1 ..................................................................................................13

U.S.S.G. § 2B1.1(b)(1)(K) ...................................................................................13

U.S.S.G. § 2B1.1(b)(16)(A)(iii) ...........................................................................13

U.S.S.G. § 2B1.1(b)(2)(A)(i) ................................................................................13

U.S.S.G. § 3D1.2(d) .............................................................................................13

U.S.S.G. § 3E1.1(a) ..............................................................................................13

U.S.S.G. § 3E1.1(b) ..............................................................................................13

## OTHER AUTHORITIES

Elizabeth Szockyj, Imprisoning White-Collar Criminals?,
    23 S. Ill. U. L.J. 485 (1999) .......................................................................24, 26

Ellen S. Podgor, <u>The Challenge of White Collar Sentencing</u>,
   97 J. Crim. L. & Criminology 731 (2007) ...............................................................24

Geraldine Szott Moohr, <u>Roundtable – The Criminalization of Corporate Law</u>,
   2 J. Bus. & Tec. Law 25 (2007) .............................................................................26

The Sentencing Project, <u>Incarceration and Crime: A Complex Relationship</u> (2005)...................25

United States Sentencing Commission, <u>Third Symposium on Crime and Punishment in
the United States: Symposium on Federal Sentencing Policy for Economic Crimes and
New Technology Offenses</u> (Oct. 12-13, 2000) ...........................................................26

## TABLE OF EXHIBITS

Exhibit A –      Letter to the Court from Jeff Greenfield

Exhibit B –      Letter from Dr. Mary Siemes, Ph.D.

Exhibit C –      Letter to the Court from Matt's son

Exhibit D –      Letter to the Court from Robert Stillman

Exhibit E –      Letter to the Court from Melinda Ganeles

Exhibit F –      Letter to the Court from Liz Brevetti-Moss

Exhibit G –      Sentencing Letters to the Court from Various Friends and Neighbors

Exhibit H –      Letter to the Court from Susan Langer Weitzman

Exhibit I –      Letter to the Court from Steven Caligor

Exhibit J –      Letter to the Court from Jeffrey P. Shields

Exhibit K –      Letter to the Court from Jeffrey A. Aronsky

Exhibit L –      Letter to the Court from Larry Cohen

Exhibit M –      Letter to the Court from Nancy Friedberg

Exhibit N –      Letter to the Court from Joel Solly

Exhibit O –      Letter to the Court from Scott Ganeles (1 of 2)

Exhibit P –      Letter to the Court from Scott Ganeles (2 of 2)

Exhibit Q –      Letter to the Court from Carole Levene

Exhibit R –      Letter to the Court from Anuj Uppal

Exhibit S –      Letter to the Court from Dottie Nick

Exhibit T –      Letter to the Court from Kim Dubin

Exhibit U –      Letter to the Court from Stefanie Raichelson

Exhibit V –      Letter to the Court from Donna and Louis Gordon

Exhibit W –      Letter to the Court from Lisa Cooper

Exhibit X –      Letter to the Court from Neil Aberman

Exhibit Y –      Letter to the Court from Rabbi Seth M. Limmer

Exhibit Z –      United States Securities and Exchange Commission Judgment on Consent

Exhibit AA –     Letters to the Government, dated January 12, 25 and March 1, 2010

Exhibit BB –     Letter to the Court from Alan Haig

Exhibit CC –     Letter to the Court from Charles Abelson

Exhibit DD –     Letter to the Court from Bill Barrett

Exhibit EE –     Letter to the Court from Eric Roth

Exhibit FF –     Letter to the Court from Rabbi Douglas E. Krantz

Exhibit GG –     Letter to the Court from David Levesque

Exhibit HH –     Letter to the Court from Seth Ferman

Exhibit II –     Letter to the Court from Whitney Matza

Exhibit JJ –     Letter to the Court from Janice Kravette

Exhibit KK –     Letter to the Court from Michael W. Delduchetto

Exhibit LL –     Letter to the Court from Steven Bank

Exhibit MM –     Letter to the Court from Howard Levene

## PRELIMINARY STATEMENT

Defendant Matthew D. Weitzman, by his counsel, respectfully submits this Memorandum of Law in support of his request for a sentence that is below the stipulated Sentencing Guidelines range of 97-121 months (the "stipulated Guidelines range").  Based on the factors set forth in Title 18 U.S.C. § 3553(a), including Matt's disturbed childhood and impaired psychological state at the time of the offense, as well as his extraordinary acceptance of responsibility and self-motivated steps toward rehabilitation, Mr. Weitzman respectfully requests that the Court impose a sentence that is below the stipulated Guidelines range and does not include a lengthy term of imprisonment.

## STATEMENT OF FACTS

A.    The Offense Conduct And Guilty Plea

From approximately 1993 to March 2009, Matt Weitzman was a principal of AFW Asset Management, Inc. ("AFW"), a registered investment adviser with offices in Purchase, New York and Natick, Massachusetts.  See Information at 1.  During the relevant time period, AFW was a financial planning and investment management firm.  As a principal of AFW, Matt advised and managed client accounts.  In this capacity, when he was so authorized, Matt could sell securities or make investments and transfers on behalf of his clients.

In or around 2002, Matt started to experience personal financial difficulties.  His family's lifestyle exceeded his earnings.  To cope with his financial troubles, Matt misappropriated assets from some of his clients at AFW.  Matt accomplished his scheme in two principal ways: (1) by forging client authorization forms to obtain their funds; and (2) by making materially false statements to his clients about how he intended to invest their proceeds following the sale of certain securities in their account.  See Information at 2-3.

For instance, in or around December 2007 and January 2008, Matt sold shares of stock held by one of his clients and misappropriated the proceeds. However, Matt falsely represented to his client that the proceeds were used to purchase structured notes. See Tr. at 18:11-15. On other occasions, Matt forged client authorization forms to misappropriate client funds. See Information at 5-6. Matt executed these unauthorized wire transfers on various dates in 2008 and 2009. See Information at 6.

On March 31, 2009, through his counsel, Matt self-reported his conduct to the United States Securities and Exchange Commission ("SEC") and the United States Attorney's Office for the Southern District of New York. At the time he confessed, he was not under investigation by the Government. In June of 2009, Matt settled his case with the SEC. As part of that settlement, Matt consented to the full scope of relief sought by the Commission -- an injunction prohibiting future violations of the federal securities laws, a bar from future association with an investment advisor, and a freeze of substantially all of his assets.

Matt then agreed to waive indictment and allow the Government to proceed against him by filing an information. On October 19, 2009, the Government filed Information 09 Cr. 989 in eight counts. Count One charged him with investment adviser fraud in violation of Title 15 U.S.C. §§ 80b-6 and 80b-17 and Title 18 U.S.C. § 2. See Information at 1-4. Specifically, Count One charges that Matt fraudulently obtained over $7,000,000 of AFW client funds by (1) forging client authorization forms and (2) by lying to his clients in order to fraudulently obtain their consent to access their funds. See Information at 2. Counts Two and Three charged Matt with securities fraud in violation of Title 15 U.S.C. §§ 78j(b) and 78ff, Title 17 C.F.R. § 240.10b-5, and Title 18 U.S.C. § 2. See Information at 4-5. In particular, the Government charges that Matt made material misrepresentations to his clients when he advised them to sell

-2-

certain securities held in their accounts to facilitate his misappropriation of such proceeds.  See Information at 4-5.  Counts Four through Eight charged Matt with wire fraud in violation of Title 18 U.S.C. §§ 1343 and 2.  See Information at 5-6.  The Government alleged in these counts that Matt, by use of interstate and foreign commerce and fraudulent letters of authorization, caused an independent brokerage firm to release investors' funds to Matt, which he subsequently converted to his own use.  See Information at 5-6.

On October 19, 2009, Matt pleaded guilty to all eight counts pursuant to a written plea agreement.

Sentencing is currently scheduled for March 18, 2010.

B.    Personal History

Matthew Daniel Weitzman is 44 years-old.  He was born in New York City and raised in New Rochelle, New York, by adoptive parents.  Matt's adoptive parents are both deceased, and he never met his biological parents.  His adoptive father passed away when Matt was 17 years-old and his adoptive mother passed away when he was 29.  Matt also grew up with an emotionally disturbed non-biological sister whose pain and anger has profoundly effected Matt, even as an adult.

Matt received his Bachelor of Arts from Cornell University in 1987 and his Masters in Business Administration from Columbia University in 1993.  In 1995, he married Susie Langer, a graduate of New York Law School.  Matt and Susie have two children, ages 13 and 9.

1.    Childhood History And Relationship With Sister

Matt's adoptive parents were caring people and provided their family with financial stability.  To an outside observer, Matt seemingly had an ideal childhood with loving parents and top-notch educational opportunities.  But the appearance was deceiving.  As one long-time friend

wrote: "To the casual acquaintance it would appear that Matt has had a free and easy life. That is not really the case." Letter to the Court from Jeff Greenfield, attached as Exhibit ("Ex.") A.[1] A closer look at Matt's upbringing reveals that it was haunted by his older sister, who is emotionally disturbed.

Matt's sister caused major disruptions to his childhood development. As a teenager, she was suicidal and frequently ran away from home. He was forced to endure the difficulties that her disappearances caused and he was preoccupied with fears regarding her well-being. Matt was a regular eyewitness to a sister who was "out of control," often screaming and yelling at their parents. His sister's actions caused him, as a young child, to have terrifying nightmares about his sister murdering their mother. Matt was scared of his sister, and for many years, slept with a knife under his pillow and a wooden shelf wedging his door closed to protect himself.

Matt also witnessed his sister's numerous suicide attempts. Once, Matt interrupted his sister's suicide attempt when he found her in the garage, sitting in a running car attempting to die from carbon monoxide poisoning. On other occasions, he encountered empty pill bottles inside the house following his sister's attempts to overdose on various medications. Matt also called poison control following another instance of his sister overdosing in an effort to kill herself. Matt often saw his sister's wrists bandaged after she attempted, on several different occasions, to end her life by slashing her wrists.

Matt lived in paralyzing fear that any confrontation with his sister would cause her to attempt suicide or to strike out violently. During one incident, Matt's sister interrupted Matt's phone call and, when Matt got angry, his sister locked herself in her room for more than 24

---

[1] Attached exhibits are redacted pursuant to Federal Rule of Criminal Procedures 49.1(a) and (b).

hours.  Matt feared that his sister was trying to commit suicide behind locked doors.  He went as far as to climb a tree to look into her window to make sure she was still alive.

Last year, Matt started to attend psychotherapy sessions with Dr. Mary H. Siemes, to discuss, among other things, his relationship with his sister.  Dr. Siemes's letter to the Court described how Matt feared his sister growing up: "[She] was never physically violent towards Matthew, but he lived in fear of her.  *Confrontation was avoided at all costs, so as not to set her off,* which he feared would cause her to try and kill herself."  Letter from Dr. Siemes, attached as Ex. B (emphasis added).

His sister's status as the troubled child motivated Matt to act as the "model" son, so as not to further burden his parents.  Dr. Siemes explained that "[a]doptive children often feel they must be especially 'good' to preserve their connection to their adoptive parents."  Id.  In Matt's case, Dr. Siemes added that his "[b]eing adopted, as well as him being the younger sibling of a significantly compromised sister, added to the sense of having to be the 'good', 'healthy' child.".  Within this family dynamic, Dr. Siemes found that Matt grew up "very 'other-oriented,'" which led to him feeling little concern for his own needs throughout his life.  See id.

Matt's desire to keep others happy -- even if he did not have the means and it ultimately would destroy him -- would be his downfall.

2.    Relationship With Family

Because of his upbringing, Matt set out to be the perfect parent and model husband.  He sought to provide his children with a loving and comfortable childhood.  He was also preoccupied with avoiding family conflict at all costs -- even if it meant stealing.

-5-

a.    <u>Relationship With Wife and Kids</u>

Matt takes his responsibility as a husband and father very seriously.  He has an extraordinarily close relationship with his two sons.  Both children are in the formative stages of their lives – the eldest son is in junior high school and the youngest son is in elementary school.  The kids depend on their father for his love and guidance.  His kids feel an extremely close connection to their father and love him unconditionally.  Matt's eldest son wrote: "I have always been extremely close with my dad and loved him to death my whole life."  Letter to the Court from Matt's son, attached as Ex. C.  Moreover, Matt is intimately involved with all aspects of his children's lives.  As one friend described "[t]o say he is an involved dad is a gross understatement.  He is simply critical to their daily upbringing."  Letter to the Court from Robert Stillman, attached as Ex. D.

Despite working full-time, Matt has been heavily involved in his children's day-to-day upbringing.  He wakes up his children for school, makes them breakfast, bathes them at night and helps them with their homework.  As one mother and close friend wrote: "Matt is the hugger and the kisser.  Matt is the one who has 'camp outs' with the boys in their room when they cannot sleep."  Letter to the Court from Melinda Ganeles, attached as Ex. E.

Matt's hands-on involvement extends outside the home to his kids' extracurricular activities.  Before self-reporting his conduct to the SEC and Government, and being confined to home detention, Matt was involved heavily with organizing basketball activities for his children and other children in the community.  He attended every sporting event or game for his children as well as every parent-teacher conference.  One friend wrote that Matt's "days are committed to his children.  He attends even the most routine school activities to include class picnics, art

shows, class poetry readings and parties." Letter to the Court from Liz Brevetti-Moss, attached as Ex. F.

Scores of other letters to the Court concerning Matt's sentencing invariably attest to Matt's incredible bond with his sons. Over 60 individuals, consisting of family and friends, have taken the time to write about Matt and nearly all of them describe the extraordinarily close relationship Matt shares with his children. See Appendix of Sentencing Letters, attached as Exs. A, C-Y, BB-MM. Susie Weitzman described her husband's relationship with her kids as "unique," and wrote how the kids "mean the world to Matt and he means everything to them." Letter to the Court from Susan Weitzman, attached as Ex. H. Matt and his children are "like 3 peas in a pod," according to one friend. Letter to the Court from Steven Caligor, attached as Ex. I. Another friend conveyed: "Matt's sons were the center of his universe; he devoted time to coaching, teaching, and just being with them." Letter to the Court from Jeff Shields, attached as Ex. J. Moreover, Dr. Siemes observed that "the boys look to dad as a barometer for all sorts of understandings, and Matthew seems to know them deeply." Ex. B.

Numerous sentencing letters expressed admiration for Matt as a model parent. For example, one father stated: "I'm not embarrassed to say that I model much of my parenting after Matt and I can assure that much of the community where we live, Armonk, New York, has done the same." Letter to the Court from Jeffrey A. Aronsky, attached as Ex. K. Another parent shared: "I would often turn to [Matt] for help regarding decisions for my kids and I went to him because he always managed to keep everything in perspective and stress that they are just kids and they should have fun." Letter to the Court from Larry Cohen, attached as Ex. L. In sum, Matt has been successful in providing his kids with a safe and loving environment and, to this day, continues his hands-on role as a central caretaker of his two children.

At the same time, Matt was obsessed with preventing any conflict in the family for fear of repeating scenes from his traumatic childhood. One friend observed: "[Matt] certainly did all he could to create a very happy, full and satisfying childhood for his children and life for his wife Susie." Letter to the Court from Nancy Friedberg, attached as Ex. M. However, another friend remarked: "Matt was incredibly fearful of disappointing his wife. The fear of losing her, saying no to her, or disappointing her crippled him as an effective communicator." Letter to the Court from Melinda Ganeles, attached as Ex. E.

Matt's preoccupation with avoiding any dissonance eventually became toxic. Limits he knew should have been imposed were not. Overspending became the norm rather than the exception. At times, Matt and Susie discussed the subject of expenses, but as with many families, these discussions caused emotional distress, thus stifling productive conversation. But these arguments were too much for Matt to handle. They were reminiscent of his struggles with his sister. Haunted by the memories of his childhood, Matt could not draw lines, impose limits or assert himself. Rather than suffer more discomfort, he simply misappropriated his clients' assets to pay for a lifestyle that he thought would keep his family happy.

During the course of the offense, Matt actually contemplated committing suicide so that life insurance proceeds could be used to repay investors and provide for his family. See Ex. B. According to Dr. Siemes, Matt never considered more rational options like filing for bankruptcy. See id. Only now, in the course of therapy, Matt is beginning to understand his psychological constraints and what led him to commit the offense.

Only in the course of therapy has Matt realized the subconscious association between his sister and his family life. As Dr. Siemes detailed:

> While his wife is not his sister in conscious reality, these experiences [with his sister] have become blended in his mind. Years of traumatic experiences set a pattern of relating and operating in the world, and it is within the matrix of more intimate relationships that such experiences become overcoupled and not distinguished from the present.

Id. Thus, in light of his childhood experiences, having a dispute with his spouse and/or trying to alter the family lifestyle were not viable options.

      3.    <u>Employment History</u>

Matt has worked his whole life.  He has held a wide variety of jobs: he was a delivery and stock employee for a local pharmacy, and a day camp counselor at a Jewish community center. After college, Matt worked for Hewitt Associates, a human resource consulting firm, as a retirement plan consultant.  After four years at Hewitt Associates, Matt left the company to attend business school.

While in business school, Matt and his long-time friend, Jay Furst, started their own business, AFW.  After graduating from Columbia in 1993, Matt spent the bulk of his time building AFW into a successful wealth management firm.  Over the course of 15 years, AFW opened offices in Purchase, New York and Natick, Massachusetts.  By the end of 2008, AFW managed approximately $194,000,000 in assets.  <u>See</u> Information at 1.

Matt is currently employed by Intellipure Technologies, LLC ("Intellipure"), which sells air-purification products.  The CEO of Intellipure initially struggled with his decision to hire Matt because of the pending criminal investigation.  However, the CEO ultimately agreed to hire Matt, and he has proven to be a valuable asset to Intellipure.  Letter to the Court from Joel Solly, attached as Ex. N.  Scott Ganeles, a main investor in Intellipure, regards Matt as "focused and determined . . . and . . . instrumental in creating a culture of success."  Letter to the Court from Scott Ganeles, attached as Ex. O.

On his own initiative and without any compelled action by the Court or the Government, Matt is working hard to raise money to repay AFW's investors.  Although Matt's current earnings are approximately $3,600 per month, his new employer estimates that Matt could earn in excess of $200,000 per year starting as soon as 2010.  <u>See</u> Letter to the Court from Scott Ganeles, attached as Ex. P.  That money would be dedicated to paying back victims as quickly as possible.

4.    <u>Standing In The Community</u>

In addition to striving to be the model parent and husband, Matt was the consummate friend, neighbor and pillar of the community.  Matt's good deeds, caring nature, and devotion to his family are recognized throughout the over 60 letters written to the Court in support of Matt. <u>See</u> Appendix of Letters to the Court, attached as Exs. A, C-Y, BB-MM.

While not diminishing the seriousness of the offense, the collection of letters from Matt's family and friends place Matt's current legal problem in sharp contrast to an otherwise exemplary life.  <u>See</u>, <u>e.g.</u>, Letter to the Court from Carol Levene, attached as Ex. Q ("I have known Matt, for the past twenty plus years; since he was a young man in high school, and can assure you in spite of his recent poor judgment and employment shortcomings; Matt is a moral and ethical person."); Letter to the Court from Jeffrey A. Aronsky, attached as Ex. K ("Since the time I met him, he has been down to earth, caring of others, giving of both his time and resources, one to look up to, and a true confidant.").

Matt is recognized by others as a true friend and confidant.  <u>See</u>, <u>e.g.</u>, Letter to the Court from Anuj Uppal, attached as Ex. R.  ("As an immigrant to the United States, finding common ground with my classmates was often a challenge. . .[Matt] strove to understand my challenges and made every effort to know and understand me as a person and friend.").  Letter to the Court from Dottie Nick, attached as Ex. S.  (At a time when her husband became terminally ill, "[Matt]

-10-

made time to help me open an account at a local bank, drove my son to many activities in Armonk, and was always there to ask how we were doing and offer assistance."); Ex. J (describing how Matt became part of a small steering committee to help a mutual friend obtain a liver transplant); Letter to the Court from Kim Dubin, attached as Ex. T (detailing how Matt cared for her when she broke off her engagement ("He taught me what true friendship was all about at a vulnerable time in my life.")).

In addition, Matt worked tirelessly to organize activities for the children of the community. One neighbor described Matt as "the pillar of our community, the Dad that all the kids loved, the leader and organizer of many community, sports and family activities. If there was a challenge, Matt would rise to the occasion to solve the problem." Ex. M.

Matt organized a traveling basketball team called the Armonk Heat for his eldest son and several of his classmates. He arranged annual trips for the team to play in basketball tournaments in Philadelphia, Boston, and Albany, New York. Matt organized a similar team called the Armonk Bobcats for his youngest son, and set up an off-season basketball clinic for his classmates.

In addition, Matt spearheaded the idea of the Armonk Basketball Association ("ABA"), where over 50 kids came together on Friday nights to play intramural basketball games. Matt ordered T-shirts and a scoreboard for the kids and recruited other fathers to coach the weekly games with him. Matt intended for the ABA to serve as non-competitive place to play basketball. In recognizing Matt's good intentions, one neighbor noted how "[k]ids and parents alike consistently and secretly hoped that Matt would be in charge of organizing activities like the basketball league he created because he did so with a fairness and enthusiasm that spoke to his love of kids." Ex. U.

Matt also coached soccer and baseball for his two sons and showed great sportsmanship during sporting events. See, e.g., Ex. V ("During soccer seasons over the years there is not a time I cannot recall not having seen Matt at a game, not only cheering his boys, but often high fiving a friend of [his son's] for a goal scored even if it were on the opposite team."); Letter to the Court from Lisa Cooper, attached as Ex. W. ("Despite the fact that my sons were two of the 'less coordinated' athletes on the team, Matt treated them as if they were stars."); Letter to the Court from Neil Aberman, attached as Ex. X. ("[Matt] has the right coaching perspective. To him, winning isn't everything.").

Moreover, Matt is well-known within the Jewish community for having organized Shabbat dinners in his home on Friday nights. In an effort to foster his sons' commitment to Judaism and attendance of Hebrew School, Matt has invited the Rabbi from his local synagogue and several other families to his home for dinner and discussion. Through these Shabbat dinners, Rabbi Seth M. Limmer believed "Matt Weitzman helped an entire generation at our congregation find a way first to be comfortable with their Jewish heritage and then to learn to make it a most important part of their lives." Letter to the Court from Rabbi Seth M. Limmer, attached as Ex. Y. Further, upon self-reporting his conduct, Matt has frequently visited with Rabbi Seth M. Limmer, who described his interactions with Matt:

> For a long time now, I have been in conversations with Matt about the meaning of atonement, of what we in Hebrew call *teshuvah*, literally turning ourselves around towards the people we want to be. I have been deeply impressed at how seriously and deeply Matt has engaged with these teachings.

Id. As captured by Rabbi Limmer, Matt is still committed to his religious and spiritual enlightenment.

C.    Matt Self-Reports To The Government And The Guilty Plea

    1.    Matt Self-Reports To Government Authorities

In late March of 2009, Matt retained counsel to help him surrender to federal authorities. On March 31, 2009, despite never having received any subpoena or inquiry from the U.S. Attorney's Office or the SEC, Matt, through counsel, voluntarily reported his conduct to the SEC and the Government.  Shortly thereafter, Matt began voluntarily cooperating with the SEC to settle its case against him.

    2.    The Plea Agreement, Allocution, And SEC Settlement

On October 19, 2009, Matthew Weitzman pleaded guilty to Counts One through Eight of the Information, pursuant to a written plea agreement.  As set forth in the Plea Agreement, the parties agreed to group Counts One through Eight pursuant to U.S.S.G. § 3D1.2(d).  The parties further stipulated that the Sentencing Guidelines sections applicable to Counts One through Eight are Sections §§ 2B1.1, 2B1.1(b)(1)(K), which set a base offense level of 7, to which 20 levels are added based upon a total loss of $7,212,032.  Two levels are added to the base offense level, pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(i), because the parties agreed the offense involved more than 10 victims.  Further, four levels are added to the base offense level because Matt was a person associated with an investment adviser under U.S.S.G. § 2B1.1(b)(16)(A)(iii).

The parties also agreed to deduct two levels pursuant to § 3E1.1(a), for Matt's acceptance of responsibility, and an additional one-level reduction because of his timely notice of his intention to enter a guilty plea, which allowed the Government to avoid preparing for trial and permitted the Court to allocate its resources elsewhere.  See U.S.S.G. § 3E1.1(b).

According to the Plea Agreement, the adjusted offense level is 30, which yields a Sentencing Guidelines range of 97 to 121 months' imprisonment.  Matt acknowledges that this

application of the Guidelines is technically correct.  However, the Plea Agreement permits Matt to argue for a sentence below the stipulated Guidelines range based on the factors set forth in 18 U.S.C. § 3553(a).  Plea Agreement at 3-4.

Although Matt seeks a sentence below the stipulated Guidelines range, he fully accepts responsibility for his actions.  During his allocution, Matt fully acknowledged the wrongfulness of his conduct.  He admitted taking over $7 million in client funds and said  "I take full responsibility for my actions.  I apologize to every person I've hurt, to my family, and to the Government.  I will do everything in my power to help raise money to pay people back.  I'm truly sorry, your Honor."  Tr. at 19:19-22.

As part of bringing this matter to a swift resolution, Matt also voluntarily produced information to the SEC and agreed to a partial settlement of the SEC's case against him almost immediately.  See Judgment on Consent, 09 Cv. 5353, attached as Ex. Z.  In connection with the settlement, Matt consented to a freeze of substantially all of his assets.  Matt also sold his home – which had been paid for with proceeds of the fraud – in order to immediately return money to investor-victims.  In January and March 2010, Matt tendered the proceeds from the sale of his home and other funds -- totaling $1,533,462.12 -- to the Government for restitution to the victims.  See Letters to the Government, dated January 12 and 25 and March 1, 2010, attached as Ex. AA.  In addition, as part of his settlement with the SEC, Matt consented to a permanent injunction against any future violations of the federal securities laws and consented to bar from association with an investment advisor, effectively banning him from the profession he had worked in for over 15 years.

<u>ARGUMENT</u>

THE FACTORS SET FORTH IN § 3553(A) COUNSEL A SENTENCE
<u>BELOW THE STIPULATED GUIDELINES RANGE</u>

A.    <u>Applicable Law</u>

In <u>United States</u> v. <u>Booker</u>, 543 U.S. 220 (2005), the Supreme Court rendered the

Sentencing Guidelines "effectively advisory."[2] <u>Booker</u>, 543 U.S. at 245.  As the Second Circuit

has observed post-<u>Booker</u>, "[i]t is now. . . emphatically clear that the Guidelines are guidelines --

that is, they are truly advisory."  <u>United States</u> v. <u>Cavera</u>, 550 F.3d 180, 189 (2d Cir. 2008).

Following <u>Booker</u> and its progeny, sentencing courts are no longer required to impose a

Guidelines-range sentence.  <u>Booker</u>, 543 U.S. at 225-27.

As a procedural matter, district courts "must treat the Guidelines as the starting point and

the initial benchmark" in calculating a sentence.  <u>United States</u> v. <u>Kimbrough</u> 552 U.S. 85, 108

(2007) (quoting <u>Gall</u> v. <u>United States</u>, 552 U.S. 38, 49 (2007)).  However, sentencing courts may

not presume that a Guidelines sentence is reasonable.  <u>Nelson</u> v. <u>United States</u>, ---U.S.----, 129 S.

Ct. 890, 892 (2009) ("The Guidelines are not only *not mandatory* on sentencing courts; they are

also not to be *presumed* reasonable.") (emphasis in original); <u>see</u> <u>also</u> <u>Cavera</u>, 550 F.3d 180, 189

("district court may not presume that a Guidelines sentence is reasonable").

Instead, while sentencing courts must first consider the defendant's Guidelines range,

Policy Statements, and any applicable departures, they must also consider the other directives set

forth in the Sentencing Reform Act under 18 U.S.C. § 3553(a).  <u>See</u> <u>United States</u> v. <u>Crosby</u>, 397

---

[2] Specifically, in <u>Booker</u>, the Supreme Court severed and excised two provisions of the federal sentencing scheme: 18 U.S.C. § 3553(b)(1), requiring district courts to impose sentences within the Guidelines range unless a departure is warranted, and 18 U.S.C. § 3742(e), setting forth standards of review on appeal from sentences and based on the Guidelines' mandatory nature. <u>Booker</u>, 543 U.S. at 259.

F.3d 103, 111 (2d Cir. 2005) ("[S]entencing judges remain under a duty with respect to the Guidelines -- not the previously imposed duty to apply the Guidelines, but the continuing duty to 'consider' them, along with the other factors listed in section 3553(a)."). Thus, even as a starting point, the Guidelines are only one factor among several a sentencing court must consider in fashioning a sentence that is "sufficient, but not greater than necessary" to achieve the purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2). See Gall, 552 U.S. 38, 49-50.[3]

Under 18 U.S.C. § 3553(a), the key requirement is that the sentence in each case be "sufficient, but not greater than necessary":

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correction treatment in the most effective manner.

18 U.S.C. § 3553(a)(2); see also United States v. Toback, No. 01 Cr. 410, 2005 WL 992004, at *3 (S.D.N.Y. Apr. 19, 2005) (citing Booker and Crosby). Under the sentencing regime created by Booker, consideration of the § 3553(a) factors is mandatory. See Crosby, 397 F.3d at 114. Significantly, the Court's ruling in Booker confers upon sentencing judges broader discretion to fashion a reasonable sentence based on, among other factors, "the nature and circumstances of

---

[3] In addition, the Guidelines should not be assigned any presumptive weight over the other factors set forth in § 3553(a). United States v. Langford, 516 F.3d 205, 223 (3d Cir. 2008) ("The Supreme Court's emphasis shows that the Guidelines should not be granted presumptive weight over the 'array of factors' considered in the § 3553(a) analysis."); United States v. Verkhoglyad, 516 F.3d 122, 131 (2d Cir. 2008) ("[T]he requirement to consider § 3553(a) factors is *not* synonymous with any requirement that a particular factor be given determination or dispositive weight in the identification of the appropriate sentence.") (emphasis in original) (internal quotations and citations omitted).

the offense and the history and characteristics of the defendant . . . ."  18 U.S.C. § 3553(a)(1); see also Cavera, 550 F.3d at 187 (noting the ability of courts to tailor sentences in light of § 3553(a) factors other than the Guidelines range).  Sentencing courts must also consider "the need to provide restitution to any victims of the offense."  18 U.S.C. § 3553(a)(7).  Thus, courts are fully empowered to impose sentences below the otherwise applicable Guidelines range after an analysis of the factors set forth in 18 U.S.C. § 3553(a).

B.    Discussion

Consideration of the factors enumerated in § 3553(a) support a lenient sentence that is below the stipulated Guidelines range.

1.    Matt's History And Characteristics

Matt's "history and characteristics" counsel heavily against a lengthy term of imprisonment.  Matt had no criminal record, lived an honorable life, and served as a role model to others.  Prior to the instant offense, considering his traumatic upbringing and his lifetime commitment to his children, wife, community and work, the Court should impose a lenient sentence.

a.    Childhood Background

Although Matt had loving adoptive parents, his psychological development was impaired significantly by living with a psychologically and emotionally unstable sibling.  His sister's numerous suicide attempts and sudden disappearances made for an unhealthy environment. His sister's outbursts with their parents also caused recurring nightmares.  These negative influences have shaped Matt as an adult and have impacted every relationship in his life.  In reaction to his childhood, Matt became fearful of confrontation in his personal relationships.  See Ex. B.

-17-

Moreover, as Dr. Siemes details, Matt "grew up in a manner of being very 'other-oriented', the focus on his sister and her difficulties, in an environment where everyone walks on eggshells, and where a true sense of self cannot emerge."  <u>Id</u>.  Although the psychological trauma endured as a child does not excuse Matt's offense, his childhood contributed to his inability to ask for help and putting the needs of others before his.  <u>See id</u>.  Asking for help meant failure at solving his problems and potentially exposing loved ones to humiliation.  <u>See id</u>.  The pressure was too great for Matt, and, regrettably, in response he misappropriated assets in a misguided effort to maintain domestic tranquility.

The Second Circuit has recognized that a defendant's difficult childhood is an appropriate factor in determining an appropriate sentence.  <u>See</u> <u>United States</u> v. <u>Tann</u>, 332 Fed. App'x 674, 676, 2009 WL 1605124, at *1 (2d Cir. June 9, 2009) (upholding reasonableness of below-Guidelines sentence that took into account "the difficult circumstances relating to [defendant's] upbringing"); <u>see also</u> <u>United States</u> v. <u>Erskine</u>, 280 Fed. App'x 16, 19, 2008 WL 2228600 at *2 (2d Cir. May 28, 2008) (upholding reasonableness of sentence 30 months below the applicable Guidelines range where sentencing court considered defendant's "difficult childhood"); <u>United States</u> v. <u>Patzer</u>, 548 F. Supp.2d 612, 618 (N.D. Ill. 2008) (considering defendant's difficult childhood in granting a non-Guidelines sentence for a career offender).

Moreover, courts have granted reduced sentences where the defendant's family or childhood background contributed, at least in part, to the defendant's commission of the offense. For example, in <u>United States</u> v. <u>Castillo</u>, No. 03-CR-835 (RWS), 2007 WL 582749, (S.D.N.Y. Feb. 26, 2007), Judge Sweet granted a non-Guidelines sentence to a defendant who felt unusual financial pressure to care for his family.  <u>Id</u>. at *6.  The defendant's mother died when he was 8 years-old, and his father died when the defendant was 19 years-old.  Upon his father's death, the

-18-

defendant experienced trouble eating and sleeping and had suicidal thoughts. <u>Id</u>. He also became financially and emotionally responsible for his stepmother, half-siblings, the child of one of his half-siblings, and his own two children. <u>Id</u>. at *7. When he could not make enough money to support his extended family, the defendant sold drugs. <u>Id</u>. at *4. Judge Sweet granted a non-Guidelines sentence, concluding that "[w]hile these life events do not excuse the instant offense conduct for which Castillo is now being sentenced, they most likely contributed to Castillo's involvement in this criminal activity." <u>Id</u>. at *7; <u>see also</u> <u>United States</u> v. <u>Brady</u>, 417 F.3d 326, 331 (2d Cir. 2005) (remanding case to district court to determine whether a non-Guidelines sentence was warranted where defendant argued that the childhood abuse she experienced from her biological and foster parents made her "particularly vulnerable" to entering into the fraudulent scheme).

Matt experienced comparable family pressures. He felt an almost pathological need to provide for his wife and kids as the sole financial provider and caretaker. In Matt's mind, not providing the ideal lifestyle for them would have caused those around him to be unhappy, triggering visions of his nightmarish childhood. As in <u>Castillo</u>, while not excusing the instant offense, Matt's background contributed to his involvement with the criminal activity and, thus, warrants a sentence below the stipulated Guidelines range.

b.    <u>Devoted Father To His Two Sons</u>

Matt's role as a devoted father of two boys also weighs in favor of a sentence below the stipulated Guidelines range. A lengthy period of incarceration would be detrimental to the boys' development, especially in light of their extraordinarily close relationship with their father.

It is beyond cavil that sentencing courts may consider a defendant's ties to his children and family as a mitigating factor in sentencing. For example, in <u>United States</u> v. <u>Davis</u>, No. 07

-19-

Cr. 727 (HB), 2008 WL 2329290 (S.D.N.Y. June 5, 2008), the defendant received a non-custodial sentence based on his particularly close relationship with his six children. Id. at *6. The defendant was deeply involved in the children's daily lives, played sports with them, took them to movies and parks, supported their extracurricular and school activities, assisted with their homework, attended parent-teacher conferences, and took responsibility for their health care needs. Id. at *2. On these facts, and even with another parent available to handle the parenting duties, Judge Baer imposed a non-Guidelines, non-custodial sentence, reasoning that any term of imprisonment would be "disastrous" to his whole family. Id. at *5.

Family circumstances have frequently have been the basis for Courts in this Circuit to grant sentences below the applicable Guidelines range. See, e.g., United States v. Selioutsky, 409 F.3d 114, 120 (2d Cir. 2005) (remanding for district court to make additional findings for consideration of either a departure or non-Guidelines sentence based on family circumstances where defendant's elderly parents may have needed his "physical presence"); United States v. Harding, No. 05 CR. 1285-02 (RWS), 2006 WL 2850261, at *2 (S.D.N.Y. Sept. 28, 2006) (granting below-Guidelines sentence because of defendant's "significant network [of family and community members] that is ready to support [the defendant] upon his release from prison"); see also United States v. Butler, No. 08-CR-370, 2010 WL 234848, at *4 (E.D.N.Y. Jan. 22, 2010) (imposing a non-Guidelines sentence in case involving "staggering" losses, where defendant's large community of friends and family, including his wife and child, attested to his good character); United States v. Jiang, No. 09-CR-34, 2009 WL 3254434, at *1-2 (E.D.N.Y. Oct. 9, 2009); (granting a sentence of 30 months from an applicable Guidelines range of 70-87 months where, inter alia, the defendant had "a strong work history and many friends and supporters in the community. . .[and] has a supportive family and provides for his wife and two teenage

children"); United States v. Cho, No. 08-CR-332, 2009 WL 5322746, at *2 (E.D.N.Y. Oct. 6, 2009) (granting non-Guidelines sentence where defendant appeared contrite and had a close family relationship with his mother who was recently diagnosed with a tumor, requiring surgery); Primo v. United States, No. Cv-07-3387 (CPS), 2008 WL 428449, at *2 (E.D.N.Y. Feb. 14, 2008) (noting that sentencing court considered defendant's relationship with his children in imposing a non-Guidelines sentence).

It is clear from the appendix of sentencing letters that Matt's sons have a significant bond with their father. They would be deeply harmed by his lengthy absence. Moreover, although Matt worked full-time, he has always been fully attentive to his sons' every need. He wakes up his kids for school, dresses them, makes them breakfast, attends parent-teacher conferences, reads them their bedtime stories, helps them with their homework, and talks them through their problems, among other things. Thus, Matt's exceptionally close relationship with his kids presents a mitigating factor for the Court, warranting a sentence that is below the stipulated Guidelines range.

2.    The Nature And Circumstances Of The Offense

As part of its analysis, the Court is required to consider the "nature and circumstances of the offense." 18 U.S.C. § 3553(a)(1). Matt recognizes the seriousness of his offense. He accepts full responsibility for stealing from those who trusted him. Proof positive of Matt's appreciation of the offense is that nobody had to investigate him, subpoena him, arrest him or indict him to get him to realize the magnitude of his misconduct. He did it himself.

That said, at the time of the offense, Matt was unable to fully comprehend the potential consequences of his actions. Dr. Siemes detailed how Matt lacked a full sense of understanding of the "realistic consequences" of his offense:

-21-

> [H]e had no ability to see how his actions [which were focused in his mind on taking care of his wife and her needs] would affect him, how his choice of stealing money would impact him, his family, and those he stole from. His myopic perspective could not and did not comprehend the full impact.

Ex. B.

At the time of the offense, Matt's mind was focused on solving the problem of mounting debt, which had accumulated throughout the course of his marriage. Nor were his actions malicious. As Dr. Siemes conveys, "there was no sense of achievement or 'getting one over' on someone. . .[T]he money seemed to serve as a means to an end – the end being getting rid of the debt hanging over his head." Id. Thus, fraud became the twisted solution to his personal problems.

Sentencing courts routinely consider defendants' mental condition when deciding whether to grant a sentencing reduction. See, e.g., United States v. Regensberg, 635 F. Supp.2d 306, 312 (S.D.N.Y. 2009) (considering defendant's professed gambling disorder in analyzing § 3553(a) factors and granting a below-Guidelines sentence of 100 months from the bottom of the recommended sentencing range of 108 to 135); United States v. Mizrahi, No. 00-CR-960 (JBW), 2008 WL 3009983, at *2 (E.D.N.Y. June 16, 2008) (granting a below-Guidelines sentence where defendant suffered psychological trauma for 8 years caused by guilt of committing the offense).

Moreover, psychological conditions are an appropriate basis for a variance from the applicable Guidelines range where the defendant demonstrates a commitment to recovery. In United States v. Taylor, No. 07 Cr. 247 (RSW), 2008 WL 2332314 (S.D.N.Y. June 2, 2008), the defendant, who pled guilty to receipt and distribution of child pornography, was reported to have, among other things, an arrested psychosexual development, low self esteem, long-term depression, and severe social phobia. Id. at *3-4. Judge Sweet concluded that a below-

Guidelines sentence was appropriate where these psychological conditions contributed to the conduct and where a lengthy period of incarceration might have stagnated the defendant's psychological development process. Id. at *8.

In this case, Matt's emotional and psychological condition, as described by Dr. Siemes, weigh in favor of a sentence below the stipulated Guidelines range. Matt has a demonstrated desire to seek and continue therapeutic treatment. He has attended twice weekly therapy sessions with Dr.Siemes since July 2009. He has logged in over 50 hours of psychotherapy and has showed signs of progress. See Ex. B ("He is beginning to comprehend for the first time in his life how his family dynamic have shaped his perspective and influenced his choices and experiences.").

A lenient sentence would permit Matt to continue his treatment and continue down the road to recovery.

3.    Need To Make Restitution To Victims[4]

After self-reporting his conduct to the SEC and the Government, Matt has done everything possible to mitigate the impact on his victims. Matt pleaded guilty well in advance of trial, thereby preserving judicial and Government resources. He has already made great headway in assembling funds for repayment to the victims. Recognizing that his home was purchased with proceeds of the fraud, he sold the home on his own initiative and has collected other funds to repay investors. In total, Matt has recovered over $1.5 million from the proceeds of the sale and the collection of other funds and has tendered this amount to the Government.

Repayment to investors can be achieved much more quickly if Matt can continue his employment at Intellipure. He will use the salary he earns to repay investors until the last penny

---

[4] 18 U.S.C. § 3553(a)(7).

is paid to the last investor. Although his current earnings are only $3,600 per month before

taxes, Intellipure's main investor anticipates that Matt may earn in excess of $200,000 per year

during each of the next three years if he were not incarcerated. *Repayment to the victims will*

*take years longer if he is incarcerated for a substantial period of time.* This opportunity for

which Matt can raise money to pay back victims more efficiently and quickly, supports a lenient

sentence under §3553(a). See United States v. Peterson, 363 F. Supp.2d 1060, 1062 (E.D. Wis.

2005) (sentencing defendant charged with bank fraud to one day in prison and five years

supervised release where defendant had a "reasonably well-paying job" from which he could

repay the money he stole); see also United States v. Behrendt, No. 08-CR-71, 2008 WL

4643380, at *3 (E.D. Wis. Oct. 20, 2008) (granting non-custodial sentence for defendant guilty

of converting deceased mother's social security funds where prison sentence would have caused

defendant to lose his job and impede his efforts at repaying government).

    4.    <u>Need To Provide Specific Deterrence</u>[5]

    Matt poses no threat of recidivism. He is a first time, non-violent offender who is

committed to rehabilitation. With respect to first time offenders, lengthy prison terms do little to

prevent recidivism as "white collar offenders are, for the most part, individuals who are not

committed to a career of crime." Elizabeth Szockyj, <u>Imprisoning White-Collar Criminals?</u>, 23 S.

Ill. U. L.J. 485, 494 (1999); see generally Ellen S. Podgor, <u>The Challenge of White Collar</u>

<u>Sentencing</u>, 97 J. Crim. L. & Criminology 731, 734, 757-58 (2007) (arguing against the necessity

of giving draconian sentences to non-violent first offenders who commit white collar crimes

given the unlikelihood of recidivism and lack of need to prevent future dangerousness). In fact,

as noted above, Matt has already turned the corner; he self-reported his conduct to the

---

[5] 18 U.S.C. § 3553(a)(2)(C).

Government and shortly thereafter agreed to a settlement with the SEC.  See United States v.

Milne, 384 F. Supp.2d 1309, 1312 (E.D. Wis. 2005) (noting that defendant's acceptance of

responsibility by voluntarily reporting his conduct bears directly on the deterrence analysis).

These actions demonstrate a commitment to turning his life around.  As discussed, the SEC

settlement also significantly reduces the risk of recidivism, given that Matt agreed to a bar from

future association with an investment advisor.  He will no longer be in a position to commit these

bad acts.

        Matt also has a support network of his friends and family and an employer willing to let

him work as much as possible to earn money to pay back victims.  A strong support network of

friends and family, along with current and future employment, ensures a low risk of recidivism.

See The Sentencing Project, Incarceration and Crime: A Complex Relationship, at 7 (2005) ("[A]

critical predictor of success for person returning to the community is family connections, and

prospects for employment are strengthened for persons who are able to maintain some degree of

attachment to their former network of contacts.").  Matt's friends and neighbors are convinced

that there is no likelihood of recidivism.  See, e.g., Ex. BB ("I have no doubt that Matt will never

make choices like this again."); Letter to the Court from Dr. Charles Abelson, attached as Ex. CC

("I do not see this loving and dedicated father as an ongoing threat to the community."); Letter to

the Court from Bill Barrett, attached as Ex. DD ("I don't believe that he is a threat to the public at

all.").  This Court can be confident that it will never see Matt Weitzman before it again.

        5.    Need To Afford Adequate General Deterrence[6]

        As others in Matt's community have come to learn about his offense, they see firsthand

the destruction to his family that his criminal actions have caused.  See, e.g., Letter to the Court

---

[6] 18 U.S.C. § 3553(a)(2)(B).

from Eric Roth, attached as Ex. EE ("His wife and his children have paid dearly for his

actions."); Letter to the Court from Alan Haig, attached as Ex. BB ("The termination of his

career in finance, the loss of reputation, and the other steps he has taken would be hard for all of

us.  But even worse has been the toll on his family.").  Witnessing such destruction may deter

others in his community from violating the law.  Matt's visible fall from a respectable

businessman to a convicted felon is enough to promote general deterrence from crime.

       As Judge Rakoff stated in United States v. Adelson, 441 F. Supp.2d 506 (S.D.N.Y.

2006), "there is considerable evidence that even relatively short sentences can have a strong

deterrent effect on prospective 'white collar' offenders."  Id. at 514 (S.D.N.Y. 2006) (citing,

among other sources, Elizabeth Szockyj, Imprisoning White-Collar Criminals?, 23 S. Ill. U. L.J.

at 492 (noting that "[m]ost judges and prosecutors view general deterrence as the [sic] of the

goals, if not the major purpose, in sentencing white-collar offenders")).  Moreover, as stated by

one legal author, "lengthy prison terms may be unnecessary in the white collar world: if potential

wrongdoers recognize a risk of penalties, even relatively short prison sentences are likely to act

as a strong deterrent."  Geraldine Szott Moohr, Roundtable -- The Criminalization of Corporate

Law, 2 J. Bus. & Tech. L. 25, 34 (2007) (citation omitted); see also U.S. Sentencing Comm'n,

Third Symposium on Crime and Punishment in the United States: Symposium on Federal

Sentencing Policy for Economic Crimes and New Technology Offenses, Professor Daniel Nagin,

at 22 (Oct. 12-13, 2000). ("One consistent finding in the deterrence literature is that the certainty

rather than the severity of punishment seems to be the most effective deterrent.").  A lengthy

term of prison in this case would not enhance the objective for general deterrence.

6.      Need To Facilitate Rehabilitation[7]

Matt has engaged in extraordinary efforts to seek rehabilitation, undermining the need for a lengthy prison sentence. He has sought counseling and therapy to resolve his psychological issues. He attends therapy sessions at least twice per week with Dr. Siemes. Matt has developed a close, productive relationship with Dr. Siemes and has demonstrated signs of progression on some of the issues that have plagued him from the traumatic experiences of his childhood. See Ex. B. Matt also visits with the Rabbis at his local synagogue. Rabbi Douglas E. Krantz reports that "Matthew is taking responsibility for the wrongs he committed." Letter to the Court from Rabbi Douglas E. Krantz, attached as Ex. FF.

True to his hard-working nature, Matt found work shortly after he self-reported his conduct to the Government. He is well-regarded at his job with Intellipure and his colleagues view him as a dedicated and honest employee who is integral to the success of this start-up company. One colleague observes that Matt "has not given up on life and more than ever wants to make a positive statement for himself." Ex. N. In addition, one business colleague worries how Intellipure will fare *without* Matt's presence: "[I]t concerns me to know there will be a hole in the infrastructure should Matt be incarcerated." Letter to the Court from David Levesque, attached as Ex. GG.

A lengthy term of imprisonment will serve little if any rehabilitative function. It will not "provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2)(D); see also United States v. Arreaga, No. S303CR.1121-02 (RWS), 2006 WL 278156, at *7. (S.D.N.Y. Feb. 2, 2006) (finding that rehabilitative goals of sentencing were best served by imposition of a non-

---

[7] 18 U.S.C. § 3553(a)(2)(D).

Guidelines sentence where defendant had an apparent need for psychiatric and emotional counseling and showed a willingness to obtain such treatment).  As one childhood friend succinctly observes: "I see a man who is finding strength in re-connecting with the teachings of his Jewish religion and I see a man who deeply wants to turn his life around and help others to learn from his mistakes."  Letter to the Court from Seth Ferman, attached as Ex. HH.  A lenient sentence will only foster Matt's commitment to rehabilitating his life.

       7.    <u>Other Factors Counsel Against Lengthy Sentence</u>

       Matt has already suffered a terrible stigma by virtue of his arrest and guilty plea.  His good name and reputation have been lost and destroyed by his actions, and he has been humiliated in front of his children.  His marriage has suffered a considerable strain, which will likely cause irreparable damage to his family.  His children have also been humiliated in their community.  As one friend wrote:  "I believe that he has already endured the worst punishment – public humility, loss of respect and loss of his family."  Letter to the Court from Whitney Matza, attached as Ex. II.  Moreover, Matt has lost his position as principal at AFW and all of his income.  He has been banished from the industry in which he worked for the last 15 years.  A lengthy jail sentence would further destroy Matt's family and cause harm to his two adolescent sons.

       On the other hand, a lenient sentence that allows Matt to remain in the community for as long as possible in order to provide for his family and raise money to pay back investors, would provide a just punishment in this case.  As Judge Rakoff noted, "[i]n the case of financial fraud. . . an important kind of retribution may be achieved through the imposition of financial burdens."  <u>Adelson</u>, 441 F. Supp.2d at 514.  In other words, the obligation to pay restitution payments may satisfy the objective for retribution.  <u>See</u> <u>id</u>.  Matt must forfeit over seven million dollars; he will

most likely spend the majority of his lifetime working to pay back investors.  The financial burden alone is akin to a life sentence.

Moreover, while not diminishing the seriousness of the offense, a lengthy term of imprisonment would unduly harm Matt's two adolescent sons who are in the formative stages of their life.  One neighbor writes: "It's almost like the boys are being sentenced as well."  Letter to the Court from Janice Kravette, attached as Ex. JJ.  The children will become additional innocent victims, but one who cannot be made whole by restitution by Matt.  As the collection of sentencing letters convey, a lenient sentence is requested to ameliorate the serious loss that his two sons will experience with their father's absence.  See, e.g., Letter to the Court from Michael W. Delduchetto, attached as Ex. KK ("I appeal to you for as much leniency as possible in your sentencing of Matt for the sake of his two sons . . ."); Letter to the Court from Steven Bank, attached as Ex. LL ("Those boys need their father and if Matthew is away from them for an extended period of time, it will create a life altering and unstable environment that could be devastating."); Ex. EE ("I believe that a long sentence will not only severely impede his restitution efforts, but will also cause undue harm to his children."); Letter to the Court from Howard Levene, attached as Ex. MM (imploring the Court for a lenient sentence to keep Matt's "two young boys, in their formative years, on the right path to manhood").

Thus, for all the reasons stated above, a short, lenient sentence is "not greater than necessary" to satisfy the objectives of sentencing.

CONCLUSION

In light of the foregoing reasons, Matt respectfully requests that this Court impose a

lenient sentence that is below the stipulated Guidelines range and does not include a lengthy term

of imprisonment.


Dates:  New York, New York
        March 4, 2010

                                        Respectfully submitted,

                                        BRACEWELL & GIULIANI LLP


                                By:     ___/s/ Marc L. Mukasey_____
                                        Marc. L. Mukasey (MM-1185)
                                            A Member of the Firm
                                        1251 Avenue of the Americas
                                        New York, New York 10020
                                        (212) 508-6100
                                        Attorneys for Matthew D. Weitzman

Of Counsel:
        Craig S. Warkol
        Amy L. Katcherian

Copies to:
        AUSA Joan M. Loughnane
        USPO Nicole L. Guite