LAW OFFICES

# MELTZER, LIPPE, GOLDSTEIN & BREITSTONE, LLP

190 WILLIS AVENUE, MINEOLA, NY 11501

TELEPHONE: (516) 747-0300

FACSIMILE (516) 747-0653

INTERNET: www.meltzerlippe.com

Joshua A. Berman, Esq.
Ext 176
Email: jberman@meltzerlippe.com

*Video Conference Facilities*

April 23, 2010

<u>VIA FACSIMILE (212) 805-0426</u>
Hon. Laura Taylor Swain
Unites States Courthouse
500 Pearl Street
New York, New York 10007-1312

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2 6 APR 2010

Re: <u>United States of America v. Matthew D. Weitzman</u>
No. 1:09-Cr.-00989 (LTS)

Dear Judge Swain:

    We represent Dr. Burton Langer ("Dr. Langer"). We write in response to the letter of Charles Schwab & Co., Inc. ("Schwab"), dated April 1, 2010 (the "Schwab Letter"), regarding the allocation of funds forfeited or ordered as restitution from the defendant, Matthew D. Weitzman ("Weitzman" or the "Defendant").[1]

    In its letter of April 1, 2010, Schwab asserts that "it would be unjust" to allow Dr. Langer to share in the distribution of forfeited assets because Dr. Langer "is not a victim of Weitzman's crimes." Schwab's assertion that Dr. Langer is "not a victim" is simply untrue. Dr. Langer's forensic accountants, the Marcum Group LLP, have documented that the Defendant misappropriated approximately $8.4 million from Dr. Langer during an approximately 12-year period, from 1997 through 2009. Schwab served as the custodian of the funds under management by the Defendant during the entire period of the Defendant's thefts. And Schwab's culpability in facilitating the Defendant's fraud is the subject of a proceeding commenced by Dr. Langer against Schwab before the Financial Industry Regulatory Authority ("FINRA") in December 2009.[2]

    In the FINRA arbitration, Dr. Langer contends that Schwab acted recklessly, neglectfully and in breach of its duties to Dr. Langer in disbursing $8.4 million of Dr. Langer's savings to the Defendant based on obviously forged disbursement requests that came directly from the Defendant's fax machine, and openly bore a fax header saying "AFW Wealth Advisors." Under the account agreements between Schwab and Dr. Langer, transfers of money other than wires

---

[1] By letter dated April 15, 2010, Assistant United States Attorney Joan Loughnane responded to Schwab's letter, unequivocally rejecting Schwab's assertion that Dr. Langer was not a victim of the Defendant's fraud. This letter supplements the Government's correspondence.

[2] That arbitration is captioned <u>Dr. Burton Langer v. Charles Schwab & Co., Inc.</u>, FINRA Dispute Resolution Arbitration No. 09-06998.

ML Meltzer Lippe

*Long Island's Business Law Firm*

MELTZER, LIPPE, GOLDSTEIN & BREITSTONE, LLP

Hon. Laura Taylor Swain
April 23, 2010
Page 2

Defendant based on obviously forged disbursement requests that came directly from the Defendant's fax machine, and openly bore a fax header saying "AFW Wealth Advisors." Under the account agreements between Schwab and Dr. Langer, transfers of money other than wires directly into accounts titled in Dr. Langer's name or checks to Dr. Langer at his personal address could only be initiated by Dr. Langer, not by his outside investment advisor (i.e., the Defendant).

Schwab's letter of April 1, 2010 conceals its true motivation for falsely asserting that Dr. Langer is "not a victim." Schwab does not have a genuine interest in protecting the rights of the Defendant's other victims. Rather, Schwab's letter is an attempt to obtain a determination from this Court that Dr. Langer was not a "victim" of the Defendant's crimes, in the hope that it could use such a determination to defend Dr. Langer's arbitration claim. Schwab should not be permitted to manipulate the federal sentencing process to obtain an unfair advantage in the FINRA arbitration. Moreover, as set forth below, the alleged $1.3 million loan that Schwab described in its letter was not a real loan. Rather, it was an artifice concocted by the Defendant in an attempt to conceal his past thefts from Dr. Langer or any regulator or law enforcement officer who might inquire about the unauthorized withdrawals.

A.  **The Defendant Produced False Statements That Concealed His Thefts From Dr. Langer's Schwab Accounts**

Between 1997 and 2009, the Defendant faxed Schwab scores of forged requests purporting to be from Dr. Langer, which Schwab processed without hesitation, disbursing a total of approximately $8.4 million to the Defendant from Dr. Langer's accounts.[3] During the periods in question, Dr. Langer received monthly statements from Schwab and periodic statements from Defendant, which the Defendant reviewed with Dr. Langer in person. The Schwab statements are confusing and contained very limited information, and, to Dr. Langer, they were virtually incomprehensible. Indeed, many of Schwab's notices of wires and checks-issued stated that the funds misappropriated by the Defendant were being wired to "Dr. Langer" or that checks were being issued to "Dr. Langer." These notices did not cause any alarm because Dr. Langer understood that the Defendant had authority to move money between and among his own accounts, and the Defendant told Dr. Langer that the funds were being used to purchase bonds for his benefit. Notably, there were several years when no separate money transfer confirmations were sent from Schwab to Dr. Langer at all.[4] By contrast to the Schwab statements, the periodic

---

[3] Although the forged requests clearly bore facsimile lines indicating that they had been sent from Matthew Weitzman's office and signatures that looked nothing like Dr. Langer's signature which Schwab had on file, Schwab did not take even the most basic, reasonable steps to detect or prevent Weitzman's fraud. As set forth below, the issue of Schwab's neglect in processing Weitzman's forged transfer requests is the subject of an arbitration filed by Dr. Langer in December 2009 before the Financial Industry Regulatory Authority ("FINRA").

[4] Dr. Langer's trust of the Defendant was enhanced by the fact that in 2003, the Wall Street Journal published an article featuring a comparison of five wealth advisors in which the defendant was generously praised as the best of them. The author of the article, Ron Lieber, who decided to hire the defendant as his own personal financial advisor, wrote later in the New York Times: "We liked Mr. Weitzman's advice and demeanor. His disciplinary

502761-1

MELTZER, LIPPE, GOLDSTEIN & BREITSTONE, LLP

Hon. Laura Taylor Swain
April 23, 2010
Page 3

statements Dr. Langer received from AFW (i.e., the Defendant's asset management company) were clear and comprehensible, and the Defendant reviewed them with Dr. Langer personally. Unfortunately, they were also false and fraudulent, but they contained sufficient plausible information for Dr. Langer to believe his investments were intact.

In its letter of April 1, 2010, Schwab asserts that "Dr. Langer is not a victim of Weitzman's crimes, but rather knew about and authorized the disbursement of funds from his Schwab accounts as loans or gifts to Weitzman and his daughter." The evidence that Schwab offers for this false assertion consists of the allegations that: (a) Dr. Langer was aware of the "lavish lifestyle" of the Defendant and Dr. Langer's daughter; (b) Dr. Langer had agreed to loan money to the Defendant, including a $1.3 million loan to Weitzman in 2005; (c) unnamed Schwab compliance personnel called Dr. Langer in November 2005 and Dr. Langer told them he had agreed to loan $1.3 million to the Defendant; and (d) Dr. Langer received monthly account statements from Schwab.[5]

Contrary to Schwab's unsupported assertion, Dr. Langer was not aware of the Defendant's thefts from his accounts, and he did not become aware of those thefts until 2009. Dr. Langer also has no recollection of having received the one telephone call Schwab claims to have made during its 12-year relationship with Dr. Langer to ask if the transfers to the Defendant were authorized. (Indeed, Schwab should have called Dr. Langer regarding every disbursement it made to the Defendant from Dr. Langer's accounts because Schwab's own account agreements expressly forbade such transfers. Specifically, Schwab's account agreements allowed only "like-to-like transfers" – i.e., transfers to accounts in Dr. Langer's name or by check to Dr. Langer at his home address – to be initiated by an outside investment advisor.) Further, as set forth below, the factual context of the alleged $1.3 million "loan" from 2005 contradicts Schwab's claim that the purported loan demonstrates Dr. Langer's awareness of the Defendant's fraud.

1. The $1.3 Million "Loan" Was A Device Manufactured By The Defendant To Conceal Past Thefts

In or about November 2005, the Defendant asked Dr. Langer for the $1.3 million loan to renovate his home and Dr. Langer agreed. By that time, the Defendant had already stolen

---

record was clean and he had gone to good schools (Cornell undergraduate, Columbia M.B.A.). . . . [H]is advice was always wise, and he was willing to work with us even though we had less money than his other clients." How a Personal Finance Columnist Got Caught Up in Fraud, The New York Times, April 18, 2009.

[5] In its letter of April 15, 2010, the Government correctly pointed out, "[e]ven assuming arguendo that Dr. Langer made the loan Schwab describes, he suffered an additional multi-million dollar loss as a result of the Defendant's fraudulent transfers. Provision of a loan does not authorize millions of dollars in additional transfers." Letter, dated April 15, 2010 from AUSA Joan Loughnane. The Government also accurately noted that Dr. Langer's awareness of the Defendant's "lavish lifestyle" does not support Schwab's claim that Dr. Langer authorized the Defendant's withdrawals from his Schwab account.

502761-1

MELTZER, LIPPE, GOLDSTEIN & BREITSTONE, LLP

Hon. Laura Taylor Swain
April 23, 2010
Page 4

millions of dollars from Dr. Langer. Had Dr. Langer known of the Defendant's past thefts, he would certainly have refused to make the loan. The Defendant's documentation of a "loan" was an attempt to manufacture a plausible excuse for his past thefts. It may be no coincidence that the Defendant asked for the loan around the same time that Schwab claims to have called Dr. Langer in 2005. See Schwab Letter, p.2. Dr. Langer has no memory of any such inquiry by Schwab.

Additionally, the Defendant never made any withdrawal or series of withdrawals equaling or adding up to $1.3 million, nor were there checks written by Dr. Langer to the Defendant in any amount, following the execution of the note memorializing the purported "loan" (although the Defendant continued to steal Dr. Langer's funds for the next several years in other amounts). Other than interest paid by the Defendant periodically – which were for the sole purpose of concealing his thefts – no money ever changed hands pursuant to the loan agreement. Further, Susan Weitzman, the Defendant's wife and Dr. Langer's daughter, knew nothing about her husband's request to borrow $1.3 million from her father. The loan was solely in the name of Matthew D. Weitzman, and the Defendant told Dr. Langer not to mention it to his daughter, and it has never been repaid.[6]

    2.    Losses Suffered By Dr. Langer Above And Beyond
            The Government's Calculations

There are two additional loss amount issues that Dr. Langer wishes to bring to the Court's attention. First, it is our understanding that the Government does not have documentation regarding pre-2002 thefts by Weitzman. Dr. Langer's forensic accountants have identified millions of dollars in fraudulent transfers by the Defendant out of Dr. Langer's Schwab accounts between 1997 and 2002. Further, Dr. Langer submits that all funds moved from Schwab to the Bank of America accounts – whether the AFW Core Fund account or Weitzman's personal account – should be treated as losses caused by the Defendant's crime. We understand that the Defendant plundered the AFW Core Fund account as part of his crime, and accordingly regard amounts transferred to that account as lost by Dr. Langer on account of the Defendant's crime. We do not believe that the depletion of those accounts is traceable to genuine investment losses; rather, the AFW Core Fund account was essentially a conduit for funds going into the pocket of the Defendant.[7]

---

[6] For purposes of restitution, the phony loan transaction was plainly "relevant conduct" under U.S.S.G. § 1B1.3. U.S.S.G. § 1B1.3 mandates inclusion in loss calculations "all acts . . . committed . . . . by the defendant" (U.S.S.G. § 1B1.3(a)(1)(A)) and "all harm that resulted from the acts and omissions specified in subsection[] (a)(1) . . ., and all harm that was the object of such acts and omissions" (U.S.S.G. § 1B1.3(a)(4)). Plainly, Dr. Langer has suffered the loss of this $1.3 million just as much as the rest of the funds stolen, and the Guidelines language would include it.

[7] To date, Dr. Langer has been unable to determine which amounts were transferred by the Defendant into his personal account at Bank of America and which amounts were transferred into the AFW core account at Bank of American for the period 1997 – 2002. Schwab has not yet provided Dr. Langer with the materials necessary to reconstruct the transfers, including cancelled checks.

502761-1

MELTZER, LIPPE, GOLDSTEIN & BREITSTONE, LLP

Hon. Laura Taylor Swain
April 23, 2010
Page 5

### B. Schwab Should Not Be Permitted To Manipulate The Sentencing Process To Gain An Improper Advantage In The FINRA Arbitration Filed By Dr. Langer

Schwab is not neutral with respect to the allocation of forfeited funds, but has a self-serving interest in the outcome of the Court's restitution Order. Schwab failure to disclose the existence of the arbitration with Dr. Langer in its letter to the Court was not accidental. Schwab seeks a determination from this Court to the effect that Dr. Langer was not a "victim" of the Defendant's crimes in the hope that it could use such a determination to defend Dr. Langer's arbitration claim and escape liability.[8] A sentence which includes restitution or remission to Dr. Langer is supported by the Defendant's guilty plea allocution to the detailed Criminal Information, by the pre-sentence investigation, by the position of the government, by the position of the Defendant himself, who acknowledges having stolen his father-in-law's money over many years, and by the information contained in this letter together with any supporting documentation that Dr. Langer may supply to the Court. Whether or not Schwab will have to compensate Dr. Langer will be litigated in another forum

For all of the foregoing reasons, Dr. Langer respectfully request that the Court reject Schwab's attempt to manipulate the sentencing process to gain an advantage in its civil dispute with Dr. Langer.

Respectfully submitted,

Joshua A. Berman

cc: Frank J. Cuccio, Esq. (via facsimile: 973.514.1660)
Marc L. Mukasey, Esq. (via facsimile: 212.938.3833)
Joan M. Loughnane, Esq. (via facsimile: 212.637.2937)

---

[8] The fact that Schwab did not copy Dr. Langer on its correspondence to the Court, and that Dr. Langer independently learned of the letter in a teleconference with the United States Attorney's Office underscores Schwab's motivation in writing to the Court and lack of candor as to its purpose.

502761-1